■ In the Matter of the Estate of SAM W. BRUNNER, Deceased. SUZANNE BRUNNER et al., Appellants; JAY HOCHMAN et al., Respondents.—In a probate proceeding, the objectants appeal, as limited by their briefs, from so much of a decree of the Surrogate's Court, Queens County, dated September 9, 1975, as *inter alia* (1) adjudged and decreed that the decedent died domiciled in Queens County, (2) admitted a written instrument to probate as the last will and testament of the decedent and (3) issued letters testamentary to the persons named therein as executors. Decree reversed insofar as appealed from, on the law and facts, with one bill of costs jointly to appellants, payable out of the estate, and petition for probate dismissed. The evidence overwhelmingly supports the conclusion that decedent died a domiciliary of France. The decedent had been the successful owner of a business complex which was engaged in the manufacture of plastic products for the school stationery industry. The business was operated in Flushing, Queens, by close corporations of which he was the major stockholder. In 1965, when he was 61 years old, he had one of those corporations rent an apartment for his use in Miami Beach, for the period January 1, 1966 to October 31, 1968; the lease was thereafter extended for another year. At the time of the execution of that lease he was living in a penthouse apartment in Manhattan. He had been divorced from his first wife in 1964. For convenience to his place of business, he had altered the upper story space of one of the business buildings in Flushing into a five-room apartment, and he would stay there from time to time. On November 10, 1966 he married Suzanne Brunner, an objectant herein, who was a French citizen living in the United States. The record is not clear as to where they resided immediately after the marriage, but it is quite clear that they did not reside together in the Flushing apartment, and that they did reside in the Florida apartment (together with their daughter Giselle) for some time before they moved from Florida to France, in May, 1969. Despite his residence in Florida and France, the decedent continued his business operations until January 1, 1970. During the period in which his business operations continued he came to New York (apparently without his wife and child) from time to time, and, on at least some of those occasions, stayed in the Flushing apartment. On August 28, 1969 the decedent contracted to sell his shares in the corporations to his business associate, Gerson Strassberg, for $1,115,000, to be paid in installments over a period of six years. The minutes of the special meeting of stockholders and directors of Gersam Realty Corp. (one of the afore-mentioned corporations), dated January 1, 1970, the date of closing, include the following: "Mr. Strassberg then stated that the corporation owns a five (5) room apartment at the premises at 45-16 162nd Street, Flushing, N.Y. That this apartment was furnished by Sam W. Brunner who

lived in it. He further stated that Sam W. Brunner wished to keep the apartment so that he might have a residence in New York. He then stated that under such circumstances he believed the apartment should continue to be at the full disposal of Mr. Brunner. On motion duly made, seconded and unanimously carried, it was RESOLVED, that since the five (5) room apartment at 45-16 162nd Street, Flushing, N.Y., owned by the corporation, was furnished and lived in by Sam W. Brunner, the former president of the corporation and since Sam W. Brunner has stated that he desires to maintain an apartment in New York, the aforesaid apartment is hereby unconditionally and permanently placed at the disposal of Sam W. Brunner for his use, and be it further RESOLVED, that Sam W. Brunner shall have the further right of lending the apartment to his brother, at his own discretion, for such periods as he himself does not use it." On October 16, 1970, during the course of one of his visits to New York, the decedent executed the will which is the subject matter of this proceeding. Its opening sentence begins, "I, Sam W. Brunner, of *New York,* New York" (emphasis supplied). Paragraph "Second" provides that the will "shall be probated * * * in the State of New York". The will left to decedent's wife his personal effects and the income from "that fractional share of my residuary estate which will equal the maximum estate tax marital deduction allowable in determining the Federal estate tax", but not less than $350 a week, and with power of appointment by her. It left $10,000 to his brother, Leonard Brunner, outright, as well as the amount of $150 a week to be paid out of the income of a residuary trust. The remainder of the income of that trust was to be paid to decedent's daughter, with the principal to be paid to her in stated installments up to the age of 35. The income from a trust in the principal amount of $60,000 was to be paid to his first wife. He named as executors his accountant, Jay Hochman, Gerson Strassberg and the Chase Manhattan Bank. (The bank renounced.) After his marriage, the decedent filed joint Federal income tax returns each year. The 1968 return listed the decedent's Florida address; thereafter his French address was listed. In 1971, in response to an inquiry from the New York State Income Tax Bureau as to his failure to file State tax returns for 1968 and 1969, he deposed the following: "Last year residence in New York was 1965—at which time I lived in an apt. in Manhattan"; that he had removed his furniture and belongings "at end of 1965 to Florida—at May 19, 1969 to France"; that he had retired on December 31, 1969; that during the last five years he had not been "actually staying in New York State"; that he "left New York permanently Jan. 1, 1966"; that "when I left N.Y. in 1966—I intended to remove my residence in N.Y. permanently" and that "I intend to continue my residence at my present home in Mouans, Sartoux France". These responses were handwritten by his accountant, Jay Hochman, but the instrument was signed and verified by decedent in France. On the other hand, when it was called to decedent's attention by an Internal Revenue Service official stationed in France that he could not file a joint return (the inability to file such a return would have substantially increased his taxes) if his wife was an alien not residing in the United States, the decedent allegedly stated to him that "he had an apartment in New York and his permanent residence was in the United States; that he was merely temporarily living in France to appease his wife; that he was going to go back to the United States as soon as he could find a buyer to sell his house and the other reason being that his daughter was an American citizen and he wanted her to have an education in the United States." It is thus clear that decedent's statements to tax authorities of domiciliary facts and intentions were, as stated by the

Surrogate, those of "a man arranging tax savings". They cancel each other out and are of no aid in determining his domicile. On May 3, 1972, some 25 days before his death, decedent executed a "deed of donation" before a French notary. As stated by Surrogate Midonick (in an earlier New York County probate proceeding herein): "This is an instrument which is somewhat akin to an *inter vivos* deed of gift which is to take effect upon death of the donor" *(Matter of Brunner,* 72 Misc 2d 826, 828). In that deed, the decedent left his entire property to his wife with the proviso that "if children of donor should exist at the time of his death * * * enjoying inalienable inheritance rights * * * then the present deed of gift shall be reduced as the donee shall see fit, to the largest amount which the law permits a spouse to dispose of". In this connection, it is to be noted that a year earlier, on April 5, 1971, he had written a letter to his New York attorney wherein he stated that he intended to make a will in France, and that "under French law the child is protected better than U.S. In fact a child *cannot* be disinherited" (emphasis in original). Decedent died in France on May 28, 1972. He left a gross estate of $1.7 million; the value of his securities and cash on deposit in a Swiss bank was $1.3 million dollars. His French assets were real property of the value of $300,000, plus some $80,000 in liquid assets. His New York assets were $999 on deposit with a New York bank and a balance of some $50,000 owing in connection with his sale of his business in Queens. Jay Hochman and Gerson Strassberg, the individuals named as executors, instituted probate proceedings in New York County in July, 1972. The attorney for the proponents was Julius G. Hirsch, the decedent's long-time personal attorney. The petition listed the domicile of the deceased as "Route de Plascassier, 06 Mouans-Sartoux, France", and (apparently as the basis for jurisdiction) contained the statement "Leaving Personal Property in the County of New York". The decedent's widow and infant daughter successfully moved to dismiss the proceeding pursuant to CPLR 327 *(Matter of Brunner,* 72 Misc 2d 826, *supra).* In the course of his opinion, the Surrogate stated (pp 827–829): "While it is clear that the decedent was and always had been a natural-born American citizen, it is equally clear that he retained no place of abode in the United States and that his place of abode at the date of his death was in France, as stated in the probate petition * * * It is doubtful that an American citizen who abandoned any home in New York and resides in a substantial estate in France, which has been his only home for more than a year next before the time of his death, can still be considered at death a domiciliary of New York * * * The testator's insubstantial bank accounts in New York State provide, under these circumstances, an insufficient jurisdictional basis". For these reasons, and because there were pending in the French courts proceedings (instituted by the same petitioners) to invalidate the deed of donation, it was deemed better that the decision should be left to the French courts. The Surrogate, however, noted petitioners' contention that decedent never intended to change his domicile to France despite the provision in the petition to the contrary. Petitioners pointed out that decedent had listed a Flushing address in various 1971 and 1972 instruments (change of beneficiary of an insurance policy and his stated address in New York bank accounts). To this contention, the Surrogate replied (p 830), "that, if the decedent did not acquire a domicile outside the United States, the only domicile which he could have retained would be in Queens County (Flushing) and not New York County. If this is the fact, exclusive jurisdiction of a probate proceeding rests with the Surrogate's Court of Queens County (SCPA 206)." Nothing loath, after abandoning an appeal, petitioners proceeded to such probate of

the will in Queens County, where their petition has been sustained after trial. They assert the following facts and arguments to support their position that decedent had not changed his domicile: his marriage in New York after an antenuptial agreement signed in New York; his retention of the Flushing apartment, which he used when he came to New York; his continued devoted interest in the business even after he retired; alleged statements to friends and business acquaintances of his unhappiness about living in France; his alleged inability to speak French, which supposedly limited his communication with his daughter; his renewal of his New York operator's license; and his listing of the Flushing apartment and the Flushing corporations' addresses in various documents. It is to be noted that in the afore-mentioned proceedings in the French courts (at the trial and intermediate appellate levels) the deed of donation has been determined to be valid and the decedent has been held to have been a domiciliary of France. The findings of fact therein were, *inter alia,* that the decedent understood and spoke French; that his confidence in his wife had grown from the time he had required her to sign the antenuptial agreement, which he thereafter disregarded both in his 1970 will and in the 1972 deed of donation; and that the fact that he considered his 1970 will a "dead letter" is shown by the fact that he sent his former wife a check for $60,000, the amount stated in the will. Our conclusion that decedent was a domiciliary of France coincides with, but is in no way based upon, the decisions of the French courts. Nor is it based upon the fact that the business acquaintances who knew the decedent best originally thought so little of the Flushing apartment as a basis for jurisdiction. We agree with Surrogate Midonick's statement (p 828) that "It is doubtful that an American citizen who abandoned any home in New York and resides in a substantial home in France, which has been his only home * * * can still be considered a domiciliary of New York". We do not consider that the decedent's retention of the Flushing apartment for rent-free use for his brother and for himself (with no evidence of its use by his wife and child as well) on his occasional visits to New York negates the inference of his abandonment of a residence in New York concomitant with his retirement from business to a residence in a palatial home in France and the transfer of practically all of his removable assets to France and Switzerland. We are not impressed with the decedent's alleged statements to the resident Internal Revenue Service agent in France. At the least, they are outweighed by his documented and sworn statement to the New York State Income Tax Bureau. Although statements of dissatisfaction with his residence in France were also allegedly made by the decedent to others (including statements that "he wanted to live in California"), they are more consistent with regret that he changed his domicile and doubts as to whether he should remain, than with lack of an original intention to change his domicile to France (see 17 NY Jur, Domicile and Residence, § 25). It is to be noted that the decedent allegedly stated that "as soon as he could find a buyer" he would sell his French home and return to the United States, but there is no indication that he ever took any steps to sell. The very fact that he made so large an investment in purchasing that home, at his advanced age (when he apparently was sufficiently sophisticated to know it would be difficult to sell quickly if he changed his mind) is strong evidence indeed that he intended to make it his home for the remaining years of his life, or, at the least, until he might again decide to change his domicile. The decedent's contacts with New York after his removal to France merely demonstrate that he was wealthy enough to visit New York whenever he wanted to see his brother

and his old friends and business acquaintances. At such times it was convenient to make use of a rent-free apartment, to see how the business to which he had devoted his career was doing (especially since there were installments still owing to him on its sale), to drive a car, to hear motion pictures and television in *English,* and to be reminded of the days of his youth and middle age. They do not, in the face of all the objective evidence to the contrary, demonstrate that he retained his domicile in Queens County. Latham, Acting P. J., Damiani, Christ and Titone, JJ., concur; Shapiro, J., dissents and votes to affirm the decree insofar as it is appealed from, with the following memorandum: I do not think that we are warranted in disturbing the findings made by the Surrogate as to decedent's residence in Queens County. I therefore vote to affirm.