OPINION OF THE COURT
Millard L. Midonick, J.
The central problem presented is whether issue (two grandchildren) of Jacob J. Shubert can reopen a decree of *636 this court based upon a formal stipulation of settlement made in their behalf in open court and approved by a former Judge of this court in 1963.
The grandchildren of the decedent have filed their election to contest an alleged excessive charitable bequest pursuant to section 17 of the former Decedent Estate Law (now EPTL 5-3.3). They now move in that regard to vacate the January 15, 1964 probate and the later accounting decrees in this, their grandfather’s estate. The respondents move to dismiss the petition upon the grounds, among others, of res judicata founded upon documentary evidence. (CPLR 3211, subd [a], pars 1, 5.)
Petitioners thereafter cross-moved to be relieved from any and all of the provisions of an agreement of compromise dated August 7, 1963 and the decree approving it granted by this court November 1, 1963, in Matter of the Estate of John Jason Shubert, Sr. John J. Shubert, Sr., was the only child of Jacob J. Shubert who survived his only child, thereby entitling these petitioning grandchildren, as the only “issue” of their grandfather at the time of his death, to oppose an excessive charitable bequest of their grandfather, unless blocked by the 1963 decree. The petitioners are Sarah Catherine Shubert, who was born on March 26, 1960, and John Jason Shubert, Jr., who was born on June 12,1961. They are the children of Nancy Mae Eyerman and of John Jason Shubert, Sr. After submission of the cross motion, petitioners further moved to submit additional affidavits and for disclosure. The court has considered all of the papers submitted, including the additional affidavits and response thereto. The following decision will serve to analyze, illuminate, evaluate, narrow and ultimately to dispose of all the motions and issues now before the court.
Kerttu Helena Shubert and John J. Shubert, Sr. (he having been the only child of the testator here Jacob J. Shubert) were married in 1937. On or about January 9, 1961 John Sr. obtained a unilateral, wholly invalid Mexican divorce from Kerttu and on January 13, 1961 he married, ceremonially but bigamously, Nancy Mae Eyerman in Juarez, Mexico. John J. Shubert, Sr. died on November 17,1962, leaving a will dated December 8,1960, *637 which was offered for probate in this court by Kerttu Helena Shubert and others. That instrument made no provision for Nancy Mae Eyerman or her children, Sarah and John J. Jr., those children now being the petitioners here. In that contested probate proceeding the fiduciaries moved to strike appearances of Nancy Eyerman and her then infant children (now petitioners here) upon the ground of lack of status and standing. Guardians were appointed, one to represent the infant children in that proceeding and a guardian was appointed to represent Jacob J. Shubert, the decedent in this estate and the then surviving father of John Sr., that father then under a disability due to aging.
Objections to probate of John Sr.’s will were filed by Catherine Shubert, the mother of John J. Shubert, Sr. A trial of the following issues was directed by the court:
“(1) The validity of the decedent’s 1937 marriage to Kerttu Helena Shubert, one of the proponents;
“(2) The validity of the Mexican decree purporting to dissolve that marriage;
“(3) The rights of any of the parties to this proceeding resulting from the decedent’s marriage in Mexico to Nancy Eyerman”. (Matter of Shubert, NYLJ, April 5, 1963, p 15, col 3.)
These issues were settled and compromised during the course of trial in the estate of the son of the decedent herein, and it is that agreement which is now under attack by the former infants. Pursuant to the terms and conditions thereof the parties agreed in 1963, inter alia, “that (i) John married Kerttu in 1937 and remained married to her until his death; (ii) Kerttu was John’s widow; (iii) the divorce judgment in Mexico purportedly dissolving that marriage was void; (iv) the marriage between John and Nancy in Mexico was void; (v) Sarah and John Jr. [petitioners now] subject to the limitations stated in the Compromise Agreement, were declared to be legitimate children of John Sr. and Nancy; (vi) Sarah and John J. Jr. were each to receive $12,500 from John’s estate (to be paid to their general guardian) in full satisfaction and settlement.” One of the limitations was set forth in paragraph 6 *638 of the said compromise agreement reads as follows: “6. It is expressly agreed that said infants have no property rights, present or future, vested or contingent, in respect of Jacob J. Shubert, father of the decedent, or any post obit rights of any kind, nature or description in respect of the estate of Jacob J. Shubert upon and after his death. Without limiting the generality of the foregoing it is specifically agreed that upon and following the death of Jacob J. Shubert the said infants and each of them shall have no right, title or interest in respect of the property or estate of Jacob J. Shubert by reason of any provisions of the Decedent Estate Law, Surrogate’s Court Act or any law of this State whatsoever, including but without limitation thereto, particularly sections 17 and 83 of the Decedent Estate Law and all relevant provisions of the Surrogate’s Court Act dealing with persons interested in the estates of decedents, and said infants and their representatives have and shall have no right to receive any process whatsoever in any proceeding at law or in equity arising in respect of Jacob J. Shubert or the property of Jacob J. Shubert or any estate, testate or intestate, of Jacob J. Shubert on the occasion of his death.”
The grandfather of these petitioners, Jacob J. Shubert, who was represented at those 1963 proceedings by his own guardian, died shortly thereafter (i.e., after the above settlement in the estate of his son) on December 26, 1963. His guardian approved and signed the above settlement, as did the guardians of his then infant grandchildren now petitioning. His will was admitted to probate in this court on January 15, 1964. Under article twelfth he bequeathed his entire residuary estate to his son John J. Sr. In the event of John’s predeceasing him, which in fact had occurred, the residuary estate was bequeathed and devised to charity, the Shubert Foundation, now the moving respondent. Petitioners, having both attained their legal age as adults, seek to set aside the charitable bequest as excessive and it is asserted by them that they were never cited in the probate proceeding or in the accounting proceeding of their grandfather’s estate, despite their being his only “issue” as grandchildren pursuant to the then recent settlement. It is undisputed that the petitioners *639 were never cited or appeared in their grandfather’s estate. Respondents rely upon the settlement agreement of 1963 in the prior estate of these petitioners’ father, which by its terms expressly declared that these infant grandchildren and their representative shall have no right to receive any process whatsoever in any proceeding in law or in equity arising in respect of Jacob J. Shubert or the property of Jacob J. Shubert or any estate, testate or intestate of Jacob J. Shubert on the occasion of his death. It is obvious, therefore, that the question of the necessity of in personam jurisdiction of the infants in their grandfather’s estate, in which they were not cited nor did they appear, turns upon the validity of the agreement, stipulating settlement in John Sr.’s estate, which stipulation is now under attack. It is petitioners’ further contention that the Surrogate in 1963 lacked subject matter jurisdiction insofar as their right in and to the decedent estate property of their grandfather, Jacob J. Shubert, was severed in the agreement, while grandfather was still alive, by those terms. It is conceded that in the John J. Shubert, Sr. estate this court had full subject matter and in personam jurisdiction and that the court could adjust by compromise any controversy relating to his estate and property. Petitioners argue, however, that the statutory right of compromise did not extend to the matters affecting these petitioners’ grandfather’s property or his future estate while he was still alive, despite his being a party (protected by a guardian), during the probate controversy relating to his son’s estate. Thus, an essential point before the court for which a determination is requested is whether or not the Surrogate in 1963 had the power to approve an agreement which contained provisions extinguishing the presumptive rights of infant parties to property and future interests in an estate of a living person who was the father of their deceased father.
For an historical development of the Surrogate’s Court jurisdiction, see Matter of Runk v Thomas (200 NY 447 [1911]; 1 Warren’s Heaton, Surrogates’ Courts [6th ed], §§ 29, 35). The judiciary article (art VI) of the New York State Constitution, effective on September 1,1962 with or without the present legislative mandate, makes it clear *640 that the general powers of the Surrogate’s Court now found in the SCPA (as it took effect Sept. 1, 1967) grant full and complete jurisdiction over all matters relating to the affairs of decedents and the administration of estates and actions and proceedings arising thereunder or pertaining thereto. “The surrogate’s court shall have jurisdiction over all actions and proceedings relating to the affairs of decedents, probate of wills, administration of estates and actions and proceedings arising thereunder or pertaining thereto”. (NY Const, art VI, § 12, subd d.) An expanded and more effective general jurisdiction became clearly discernible even prior to the constitutional amendment of 1962. For example, in Matter of Raymond v Davis (248 NY 67), decided in 1928, Chief Judge Cardozo emphasized a call for a liberal construction of the general grant of jurisdiction conferred upon the Surrogate’s Court. Pointing out that earlier decisions were made upon the basis of a different grant of power, he stated at page 72: “‘Concentration of jurisdiction as to decedents’ estates’ (per Foley, S., in Matter of Haigh, supra [125 Misc 365]) is the purpose clearly revealed in the statutory scheme. ‘The State has empowered surrogates in unmistakable language, and it is not the function of the courts to discover or to fashion reasons for thwarting the manifest policy’ (per Thomas, J., in Matter of Coombs, 185 App. Div. 312, 314).” Observing also (p 72) that the specific powers contained in the former statute are to be read as “being ‘in addition to and without limitation or restriction on’ the powers that are general” he concludes: “To remit the claimant to another forum after all these advances and retreats, these reconnaissances and skirmishes, would be a postponement of justice equivalent to a denial. If anything is due him, he should get it in the forum whose aid he has invoked.” (Cf. Noll v Ruprecht, 256 App Div 926, affd 282 NY 598.) It follows accordingly that the Surrogate may assume jurisdiction in all matters affecting the affairs of the decedents. Obviously, a power so broad and extensive if exercised without discretion might overwhelm the court (e.g., the issue of negligently caused death) and as I stated in Matter of Young (80 Misc 2d 937, 941, in which jurisdiction over a contract chose in action by the estate as claimant was sustained): “Only when a sub *641 stantial or basic aspect of the administration of an estate is so involved should this court retain such causes if so requested. I have myself so abstained even on the issue of probate when the forum was inconvenient (Matter of Brunner, 72 Misc 2d 826).” (Accord Matter of Brunner, 51 AD2d 995.)
The effect of marriage of parents of out-of-wedlock children is covered in this State by section 24 of the Domestic Relations Law. The statute now legitimizes children born out of wedlock whose parents intermarried or intermarry in a ceremonial marriage, however void. This issue of legitimacy was in serious doubt, however, at the time of the 1963 settlement. Section 1135 of the former Civil Practice Act declares the effect upon the legitimacy of children of a judgment declaring a marriage void or annulling a voidable marriage. This section was repealed, effective September 1, 1963, and re-enacted as section 145 of the Domestic Relations Law, which in turn was repealed (L 1969, ch 325). Prior to 1962, and at the time of the settlement of 1963 here involved, the power of the Surrogate’s Court to legitimate children involved somewhat uncertain legal principles. This is not to say, however, that questions of legitimacy could not be raised in the Surrogate’s Court and indeed the jurisdiction of this court to determine the right to inherit property was not questioned. What is under discussion is the question of whether that jurisdiction extended to declaring issue legitimate under section 1135 of the former Civil Practice Act. In Matter of Newins (16 AD2d 436, affd 12 NY2d 824), the power of the Surrogate’s Court to legitimize issue of void marriages was upheld.
On April 17, 1961, and at the time of the settlement of 1963 now under attack, the pertinent provisions of section 1135 of the former Civil Practice Act read as follows:
“6. If a marriage be declared a nullity or annulled upon the ground that the former husband or wife of one of the parties was living, the former marriage being in force, if it appears, and the judgment determines, that the subsequent marriage was contracted by at least one of the parties thereto in good faith, and with the full belief that the former husband or wife was dead or that the former marriage had been annulled or dissolved, or without any *642 knowledge on the part of the innocent party of such former marriage, a child of such subsequent marriage is deemed the legitimate child of both parents * * *
“8. If the court be authorized by this section to decide that a child of a marriage is the legitimate child of either or both of its parents, the judgment may limit the effect of the legitimatization, to rights other than succession to real and personal property of a deceased parent”. (Emphasis supplied.)
There can be no question that the statute as it existed in 1963 authorized the court to “limit the effect of the legitimatization, to rights other than succession to real and personal property of a deceased parent.” (Civ Prac Act, § 1135, subd 8; Matter of Newins, 12 NY2d 824, supra.) In the 1963 decree, this court limited the rights of these petitioners to participate in their grandfather’s estate, not that of their father who had willed them nothing.
It has long been recognized that a person for whose benefit former section 17 of the Decedent Estate Law (now EPTL 5-3.3) was intended may waive his right under the statute to elect against an excessive charitable disposition (Matter of Stilson, 85 App Div 132; see Matter of Hills, 264 NY 349, 354; Matter of Kruger, 23 AD2d 667, affd 17 NY2d 495; Matter of Norcross, NYLJ, Aug. 2, 1976, p 7, col 1).
The court supervising the property of a person under disability had and has the clear power to authorize such waivers (former Surrogate’s Ct Act, § 40; SCPA 209, subd 4).
Where the issue is raised for the first time collaterally as in the present case and the proceedings having been ended and no appeal having been taken (in the estate of John Sr.), the courts have refused to entertain such attacks in subsequent proceedings. It has been said in broadest terms, “ ‘Where general jurisdiction is given to a court over any subject, and that jurisdiction depends, in a particular case, upon facts which must be brought before the court for its determination upon evidence, and where it is required to act upon such evidence its decision upon the question of its jurisdiction is conclusive until reversed, revoked or vacated’”. (O’Connor v Huggins, 113 NY 511, 517 [proof *643 and determination of jurisdictional facts]; accord Bolton v Schriever, 135 NY 65; Flatauer v Loser, 211 NY 15; Van Gaasbeek v Staples, 85 App Div 271, affd 177 NY 524.) Even on issues of law the jurisdiction of the Surrogate’s Court over the subject matter may be conclusively determined in its own proceeding. (Stolz v New York Cent. R. R. Co., 7 NY2d 269; SCPA 204.)
The power of a court to pass upon the existence of its own jurisdiction is well settled. The doctrine controlling in such circumstances is stated in Stoll v Gottlieb (305 US 165). The Supreme Court held that a litigated decision of a court on such an issue cannot be collaterally set aside in another proceeding since the doctrine of res judicata protects the original court’s adjudication of its subject matter jurisdiction:
“A court does not have the power, by judicial fiat, to extend its jurisdiction over matters beyond the scope of the authority granted to it by its creators. There must be admitted, however, a power to interpret the language of the jurisdictional instrument and its application to an issue before the court *** An erroneous affirmative conclusion as to the jurisdiction does not in any proper sense enlarge the jurisdiction of the court until passed upon by the court of last resort, and even then the jurisdiction becomes enlarged only from the necessity of having a judicial determination of the jurisdiction over the subject matter. When an erroneous judgment, whether from the court of first instance or from the court of final resort, is pleaded in another court or another jurisdiction the question is whether the former judgment is res judicata. After a federal court has decided the question of the jurisdiction over the parties as a contested issue, the court in which the plea of res judicata is made has not the power to inquire again into that jurisdictional fact. We see no reason why a court, in the absence of an allegation of fraud in obtaining the judgment, should examine again the question whether the court malring the earlier determination on an actual contest over jurisdiction between the parties, did have jurisdiction of the subject matter of the litigation ***
“A few years later this Court had occasion to examine again the question of the effect of a former adjudication by *644 a United States Circuit Court in a case where this Court assumed the Circuit Court had jurisdiction of the parties but not of the subject matter. The earlier adjudication was pleaded in bar to a suit to quiet title in a state court sitting in the same state as the Circuit Court. The state courts denied effect to the Circuit Court decree. On writ of error to the Supreme Court of Oregon this Court answered the contention that the ground upon which ‘the Federal court assumed jurisdiction was sufficient in law to make this case one arising under the laws of the United States’ in these words: “‘But that was a question which the Circuit Court of the United States was competent to determine in the first instance. Its determination of it was the exercise of jurisdiction. Even if that court erred in entertaining jurisdiction, its determination of that matter was conclusive upon the parties before it, and could not be questioned by them or either of them collaterally, or otherwise than on writ of error or appeal to this court.’” (Stoll v Gottlieb, supra, pp 171-172, 174-175; emphasis supplied.)
Applying the foregoing principles to the case sub judice, I conclude that the Surrogate in the prior proceeding had sufficient jurisdiction. That court was required to rule on the issues presented in the petitioners’ father’s estate and was urged to dispose completely of such matters. The fact that a declaration of legitimacy which arose in that estate litigation had impact beyond the estate could not diminish the court’s mandate or at least its option to determine all issues proposed by the parties and completely to dispose of such matters.
In the absence of bad faith or fraud, settlements of disputed claims, even out of court, have been given vigorous support by the courts. (Russell v Cook, 3 Hill 504 [Supreme Ct, 1842]; Matter of Pruyn, 141 NY 544 [1894]; Matter of Cook, 244 NY 63 [1926]; Fisher v Fisher, 253 NY 260 [1930].) In Russell v Cook (supra), the court stated at page 506: “[i]n such cases it matters not on which side the right ultimately turns out to be. The court will not look behind the compromise.”
Where an infant involved in litigation is properly represented by a court-appointed guardian he is as much bound by a final judgment thereon as a person of full age. (Matter *645 of Hawley, 100 NY 206; Matter of Baekeland, 26 Misc 2d 82; 28 NY Jur, Infants, §§64, 63.)
Although the court concludes that inquiry in that regard may not be reconsidered absent fraud or serious misconduct, some discussion may be appropriate as to whether or not the Surrogate may have erred in that decision with respect to the fairness or reasonableness of the compromise agreement, if such can be raised to the magnitude of fraud.
Clearly such judgment cannot be reviewed from the vantage point of hindsight and must be considered within the context of the facts and circumstances then existing. Given the history of the harsh treatment afforded nonmarital children under common law, and the dictates of public policy on such matters in this State in 1963, it is abundantly clear that a declaration of legitimacy was a valuable one. Section 83 of the former Decedent Estate Law authorized out-of-wedlock children (in. the default of lawful issue, which aspect was eliminated in 1965) to inherit from their mother. It created no such rights either from or in favor of the putative father. (Matter of Cady, 257 App Div 129, affd 281 NY 688; Matter of Burdak, 173 Misc 839, affd 262 App Div 1000, affd 290 NY 555; Saks v Saks, 189 Misc 667.) It was not until the addition in 1965 of section 83-a of the Decedent Estate Law that the Legislature allowed nonmarital children to inherit from their father if a court of competent jurisdiction had formally found and ordered the filiation declaring paternity of such children (L 1965, ch 958), and it was not until 1979 that the barriers against intestate succession which had excluded inheritance through the putative father were removed if formal papers were filed officially by the putative father in lieu of an order of filiation. (EPTL 4-1.2, as amd by L1979, ch 139, eff May 29, 1979.) The 1979 amendment came about as a result of the exclusion of out-of-wedlock children from standing to participate in any way in the intestate accounting of an estate of their father who had admitted paternity in a written permission for his nonadult son to marry. (Matter of Lalli, 43 NY2d 65, affd sub nom. Lalli v Lalli, 439 US 259.) Most recently, by chapter 75 of the Laws of 1981, effective September 1, 1981, for purposes of inheritance, paternity of nonmarital children can also be *646 “established by clear and convincing evidence and the father of the child has openly and notoriously acknowledged the child as his own.” (EPTL 4-1.2, subd [b].)
However, at the time of the 1963 settlement and decree now under attack, absent formal legitimization by an order of filiation during the lifetime of the putative father, or a decree upon a finding of good faith marriage or upon a stipulation to the same effect as in the 1963 settlement now attacked, these grandchildren had no right in their putative father’s estate, much less their putative grandfather’s estate. (Cf. Matter of Lalli, supra; Lalli v Lalli, supra.)
In his report in behalf of these petitioners on the record in open court before Surrogate Di Falco, the then infants’ Special Guardian declared:
“Mr. Field: If your Honor please, I feel that the record should contain some statement by the Special Guardian to indicate why he is willing to join in this petition and dispose of this matter, as indicated by a settlement agreement entered into between the parties.
“By reason of the fact that the legitimacy of my two wards was questioned, it appeared to me that my primary concern and the concern of all parties to this proceeding was to attempt to obtain an adjudication that these two children, the innocent parties to this entire proceeding, were the legitimate issue of John Shubert and of Nancy.
“After the settlement talks had been initiated, I am glad to tell your Honor that one of the first orders of business to which everyone agreed and all parties without exception agreed to was that any settlement agreement must necessarily recognize the legitimacy of the two children, and the settlement agreement so provides. It seems to me that by this act of recognizing the legitimacy of these two children the principal function of the Special Guardian has been fulfilled.”
In 1963 when a child born out of wedlock was legitimated by overcoming the then difficulties in the law, he was entitled to all of the rights and privileges flowing from that status which included inheritance rights from and through both parents, subject to express limitations in a *647 decree as provided by statute effective in 1963 (former Civ Prac Act, § 1135, subd 8).
The decree of this court dated November 1, 1963: “ordered, adjudged and decreed that Sarah Catherine Shubert and John J. Shubert, infants have no property rights, present or future, vested or contingent, in respect of Jacob J. Shubert, father of John Shubert, deceased, nor any post obit rights of any kind, nature or description in respect of the estate of Jacob J. Shubert upon and after his death and specifically, but without limiting the generality of the foregoing, that upon and following the death of Jacob J. Shubert the said infants and each of them have and shall have no right, title or interest in respect of the property or estate of Jacob J. Shubert by reason of any provisions of any law of this State including, but without limitation thereto, sections 17 and 83 of the Decedent Estate Law and all relevant provisions of the Surrogate’s Court Act and said infants and their representatives have and shall have no right to receive any process whatsoever in any proceeding at law or in equity arising in respect of Jacob J. Shubert or of the property of Jacob J. Shubert or any estate, testate or intestate, of Jacob J. Shubert on the occasion of his death.”
On the question of vacatur, the court reserves decision in respect to the petitioners’ contentions that the settlement agreement was a product of fraud, overreaching or other misconduct sufficient to undermine the 1963 decree. There is no showing of mistake or inadvertence or clerical error or any other grounds set forth in CPLR 5014.
Petitioners’ (grandchildren of Jacob J. Shubert) cross motion, under CPLR 5015 (subd [a], par 3) to vacate the decree on the grounds of fraud, misrepresentation or other misconduct of an adverse party is bottomed on their charges that (see their supplemental memorandum dated Feb. 27, 1981) there was fraudulent concealment from the court of these grandchildren’s putative rights under section 17 of the Decedent Estate Law (now EPTL 5-3.3) to contest the excessive charitable disposition in Jacob J. Shubert’s will and of the large value of such rights. The sine qua non of a charge of fraudulent concealment is of course the element of the court’s lack of knowledge. And *648 this element is controverted on the face of the challenged decree, wherein the infants expressly waive any right to Jacob J. Shubert’s (grandfather’s) estate which they might have under section 17 of the Decedent Estate Law. This court has long experience in this specialized area, and it is not credible that such a waiver could be made before the then Surrogate (who, at that time, had been on this Bench for about eight years) without its significance being transparent. While the exact value of the future estate of Jacob J. Shubert may not have been expressly before the court, petitioners cannot dispute that the court (and the parties) understood it to be very large, even enormous (since he was a very prominent public figure). An express waiver of the children’s rights under section 17 of the Decedent Estate Law inevitably meant that there might be a charitable bequest of more than one half of this grandfather’s estate (after debts), necessarily a large amount, in which the infants were relinquishing rights which might be very valuable. The right of parents, let alone grandparents, to disinherit their children and grandchildren was and is obvious to the probate Judges of every United States jurisdiction except Louisiana, so that any language of waiver of interest in their grandfather’s estate must have referred either to intestate rights or excessive charitable disposition elections since no other rights belonged to or could have been expected by these infant grandchildren. The substantial real estate properties of Jacob J. Shubert, which were of the magnitude in value of tens of millions of dollars, were excluded by the settlement from the reach of these grandchildren. The importance of legitimization apart, and the $25,000 financial award in 1963 (now yvorth approximately $71,000 according to the United States Bureau of Statistics Consumer Price Index), the real problem facing these putative grandchildren in 1963 was whether their mother in good faith believed the Mexican divorce of their father to be valid. Travel to Mexico to marry, by New Yorkers, was itself a suspicious circumstance, especially while their mother was pregnant. Moreover, their putative father appeared to be living concurrently both with his new “wife” and with his “divorced” wife both before and immediately after the void unilateral Mexican divorce. *649 Representatives of the infants and the court may have weighed, as was their proper function, that any settlement for the infants in favor of legitimization, however small the financial aspect, was better than a prospect of entire failure in litigation.
Petitioners’ supplemental memorandum, and the supplemental affidavit (of Charles E. Fedden) make much of allegedly concealed conflict of interest on the part of James N. Vaughan, Esq., deceased, the Special Guardian for Jacob J. Shubert, then alleged to be under a disability. Any connection of Vaughan to Jacob J. Shubert’s estate or to his foundation which is the respondent now, is the precise opposite of a conflict, since he was the guardian for the very person whose interests he was protecting.
In the supplemental papers petitioners have outlined the line of questioning for the pretrial examinations which they seek. Insofar as it relates to the fraudulent concealment charge, such proof cannot controvert the fact that the court clearly knew that an evidently valuable section 17 waiver was taking place. Even petitioners’ own unsupported innuendo, which may be substantiated by proof, that the Surrogate was improperly influenced (e.g., by Goldman) to approve this compromise is not relevant to the charge of fraudulent concealment.
Although it is black-letter law and the policy of this court to allow liberal pretrial disclosure, there are certain instances when it should be unavailable or closely limited and supervised. Preaction disclosure, for example, which is not unlike the stance of the present request for pretrial examination in support of a cross motion to vacate a decree, is not allowed where what is sought is to determine whether a cause of action exists. (Matter of Janosik, 71 AD2d 1058; State of New York v Braunstein, 66 AD2d 885; Matter of Simpson [Traum], 63 AD2d 583; Matter of Schenley Inds. v Allen, 25 AD2d 742.) In the instant case the allegations of fraudulent concealment of the waiver appear to fall on their face. Bare newspaper speculation appears unavailing to support charges of fraudulent concealment or other misconduct. However, the innuendo of other misconduct presents a possible appearance of impropriety due to the former Surrogate’s appointment of his former and *650 future law partner in this sensitive matter, as Special Guardian for these petitioning grandchildren while they were infants in 1963.
The courts have discretion to limit the use of disclosure to prevent “unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts.” (CPLR 3103, subd [a].) For example, pretrial disclosure is not permitted in shareholder’s derivative suits unless truly special circumstances are shown along with a significant basis for such an examination, i.e., “ ‘ “factual allegations of evidentiary value to establish the charges of improper conduct”’”. (Stepak v Alexander’s, Inc., 58 AD2d 520, 521, mod 58 AD2d 754.) The reason for this rule is the probability of ill-founded claims for purposes of harassment. (3A Weinstein-Korn-Miller, NY Civ Prac, par 3101.17.)
Speculation over many years does not constitute cause for extensive and costly litigation. None of the able and vigorous District Attorneys serving the County of New York nor the United States Attorneys serving the Southern District of New York during this entire period of almost two decades have sought indictments in connection with any such fraud or misconduct over these many years. Even though the Special State Prosecutor brought such accusations officially before his Grand Jury, and was held to have strayed beyond his jurisdiction, and even though the Court of Appeals publicly affirmed the Appellate Division’s transfer of this matter to the District Attorney of New York County with leave to apply for permission to submit the charges to another Grand Jury (People v Di Falco, 44 NY2d 482, affg 54 AD2d 218), these charges reportedly involving the Shubert settlement, were never thereafter pursued by any prosecutor in any reported matter.
In view of the fact that the parties have invited this court to participate without prejudice or disqualification in settlement discussions, and in view of the serious negotiations looking to such settlement made by the charitable foundation with the concurrence of the Attorney-General of the State of New York representing the public as ultimate charitable beneficiaries, this court encourages such possi *651 bility of settlement. Perhaps settlement can be achieved now or during or after reasonably limited depositions sought by petitioners.
On the basis of these considerations outlined above, a limited leave to take depositions seems indicated in order to determine if any evidence of substance can be elicited from a limited number of witnesses. Several witnesses, past or presently officers or managing directors of the Shubert Foundation, which is a party, may be examined by the petitioners. In view of the special circumstance that the former Surrogate appointed, as Special Guardian of these petitioners, his former and future law partner, and in view of other aspects in the record thus far, giving rise to a possible appearance of impropriety in this sensitive matter, and in view of the fact that the former Surrogate may not have been apprised of the relatively modest $25,000 award to these then infants when the legitimatizing settlement was announced on the record and approved by the court in 1963, the said former Special Guardian for these petitioners though not a party now, may also be examined by deposition. If any other nonparty witnesses are to be deposed, this court will rule on whether each may be called. In order to further limit carefully the prospective depletion of the charitable assets of the respondent foundation for unnecessary litigation expense, a limit of 30 hours of questioning is hereby imposed unless further leave shall be allowed by the court. As a further precaution limiting unnecessary expense and imposition, a law assistant of this court shall supervise the depositions as Referee, unless an outside Referee shall be designated if necessity arises. All depositions shall be conducted in this courthouse.
In view of these considerations, the decision upon the applications to vacate the decrees in this estate and to set aside, supersede or be relieved of the compromise agreement and the decree in the estate of John J. Shubert, Sr. is reserved until the said depositions shall have been concluded. The decision upon the motion to dismiss is also similarly reserved.